LAW OFFICES OF

# ROBERT C. GOTTLIEB

TRINITY BUILDING
111 BROADWAY, SUITE 701
NEW YORK, NEW YORK 10006
TELEPHONE: (212) 566-7766
FAX: (212) 374-1506
www.robertgottlieblaw.com
email:rgottlieb@robertgottlieblaw.com

ROBERT C. GOTTLIEB
CELIA A. GORDON
JORDAN M. DRESSLER
SARAH E. EAGEN

LONG ISLAND OFFICE:
*By Appointment Only*
75 Prospect Street
Huntington, NY 11743
TEL: (631) 549-9300
FAX: (631) 549-9303

March 24, 2008

<u>Via ECF and Hand Delivery</u>
The Honorable Allyne R. Ross
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE:    *United States v. Patrick Gaillard*
       No. 07 CR 438 (ARR)

Dear Judge Ross:

This law firm represents Patrick Gaillard in the above referenced case. Please accept this letter on behalf of Mr. Gaillard and in support of our request that Your Honor sentence Mr. Gaillard to a term of probation upon his plea of guilty.

Mr. Gaillard comes before this Court for sentencing on April 8, 2008 on his plea of guilty, pursuant to a plea agreement, to a one count information charging him with a violation of 18 U.S.C. § 371, Conspiracy to Defraud the United States, a Class D Felony.  A copy of the plea agreement is annexed hereto as **Exhibit "A."**

As set forth below, I respectfully submit that a full consideration of the factors set forth in Section 3553(a) of Title 18 makes it clear that a term of probation is the most fair, just and appropriate sentence, based upon the circumstances of this case.

## INTRODUCTION

Patrick Gaillard is a 55 year old man with no prior contact with the criminal justice system.  Mr. Gaillard is the elder of his parents' two living children.  His brother Philip, with whom he is very close, is a real estate developer in Brussels, Belgium.  Both of his parents are living, although his father is in extremely poor health, having had numerous heart attacks and bypasses and most recently, emergency surgery on his carotid artery.  Mr. Gaillard remains very close to his parents and plays a very important role in their care.

Mr. Gaillard has four children ranging from 29 to 22 years of age.  His oldest daughter, Robyn, is a teacher in Cambridge, Massachusetts; his daughter Leslie currently resides in California and is pursuing a teaching career; his daughter Valerie lives in Bayville, New York near Mr. Gaillard and is a student; and his son Scott is an engineer in Washington, D.C. and is married to a young woman who is a physical therapist and a Lieutenant in the Army Reserves currently stationed at the Vilseck Army Base in Germany until October of this year.

Mr. Gaillard has been divorced from his children's mother since 1992.  He currently lives alone, but has been dating Josephine Poio, a sixth grade teacher in the West Babylon Public School District, for the last six years.

All of Mr. Gaillard's family members are aware of the instant proceedings and have remained steadfastly behind him.

## THE HISTORY OF THE INSTANT CASE

Patrick Gaillard is an engineer and the owner and operator of Oyster Bay Pump Works (hereinafter "OBPW") a company located in Hicksville, New York that manufactures and sells precision liquid dispensing machines for quick and precise filling of vials, microplates and test tubes, as well as machines that automate microplate and test tube coating.

Page 3 of  28

Microplate and test tube coating machines are supplied by OBPW to companies that manufacture medical, agricultural, and veterinary diagnostic test kits.  Diagnostic kits are the basis for successful detection and treatment of new and established diseases and environmental contaminants.  Medical diagnostics applies to humans and is key to the management of the world blood supply with regard to blood typing and pre-screening of all blood before it can be used.  Agricultural applications of diagnostics concern plant and food products.  Our food supply is continuously tested for bacteria (such as e-coli, and salmonella), hormones, and environmental contaminants that make food products unsafe to consume.  Veterinary diagnostics applies to the management of all types of live farm animal populations and also the testing and treatment of pets.  OBPW works very closely with all of these manufacturers to improve their methods and to produce quality products.

Mr. Gaillard has owned and operated OBPW since 1986 when he purchased the company from its previous owner Dennis Pinkerton.  A printout of OBPW's website is annexed hereto as **Exhibit "B."**

Every year for the last 15 years, Mr. Gaillard has attended a medical trade show in Dusseldorf, Germany, specifically, the MEDICA World Forum for Medicine, International Trade Fair with Congress.  This is one of two conferences per year at which Mr. Gaillard, along with thousands of others in the worldwide medical technology industry, display and demonstrate their equipment and medical technology.  Annexed as **Exhibit "C "** is a printout of the MEDICA website.

While attending the MEDICA trade fair in November 2005, Mr. Gaillard was approached by an individual named Behzad Tehrani.  Mr. Tehrani was employed as the Marketing Director of an Iranian company called Pishtaz Teb Diagnostics (hereinafter "Pishtaz").  Pishtaz is a company that develops and manufactures immunodiagnostic test kits for the healthcare industry.  Specifically, Pishtaz produces "enzyme-linked immunosorbent assay" (hereinafter "ELISA") kits for diagnostic testing in the areas of thyroid, fertility, infectious diseases, tumor markers and neonatal tests.  A printout of Pishtaz's website is annexed hereto as **Exhibit "D."**

Mr. Gaillard was familiar with Pishtaz Teb Diagnostics and Mr. Tehrani from previous MEDICA trade fairs.  As you can see from the "Exhibitions & Events" page of the Pishtaz Teb Diagnostics website, the company exhibits every year at MEDICA (see **Exhibit "D"**).  At previous MEDICA fairs, Mr. Tehrani approached Mr. Gaillard expressing an interest in OBPW machines and requested price quotes. On each of those occasions, Mr. Gaillard informed Mr. Tehrani that he did not think he could sell his equipment to Pishtaz, as he understood Iran to be a country to which he was prohibited from exporting.

During their conversation at the fair in November 2005, Mr. Tehrani again inquired about two OBPW machines, specifically, one test tube coating system and one microplate coating system.  Mr. Gaillard again repeated that he did not believe he was permitted to export his machines to Iran.  This time, however, Mr. Tehrani explained that medical equipment is routinely purchased or acquired from United States companies by Iranian companies and that Pishtaz accomplishes this through a trading company they owned in the United Arab Emirates called Benham Trading Company located in Dubai.  Mr. Tehrani told Mr. Gaillard that they had purchased equipment from many other companies through Benham Trading and that this was a common practice in medical equipment sales.

Mr. Gaillard was at first very hesitant to agree to the sale of his equipment to Pishtaz, even providing the equipment through the trading company.  However, having been familiar with Pishtaz through the MEDICA fairs, and believing in its important contribution to the worldwide medical community, Mr. Gaillard agreed to take Mr. Tehrani's order.  Although he was aware that he was not permitted to export to Iran, he was swayed by Mr. Tehrani's suggestion to sell them his systems through Benham Trading Company in the United Arab Emirates.  Although his systems would ultimately be exported to Iran, he knew Pishtaz to be a well established, reputable company in the worldwide medical industry that shared with OBPW a common goal to aid in the diagnosis of infectious diseases.  Knowing that his microplate and test tube coating systems are the only ones of their kind in the medical industry throughout the world and that they provide a significant benefit to companies that manufacture medical test kits, Mr. Gaillard ultimately agreed to accept Mr. Tehrani's order.

Page 5 of 28

Through Benham Trading Company, Mr. Tehrani placed an order with OBPW for the aforementioned equipment. Almost one year later, in July 2006, Mr. Tehrani applied for a visa to come to the United States for the specific purpose of receiving training on the two OBPW systems he had ordered. In October 2006, Mr. Tehrani came to the United States and spent 2 ½ days at OBPW in Hicksville, New York where he received training by OBPW employees on the operation and maintenance procedures for the systems. A photograph of Mr. Tehrani taken during his visit to OBPW is annexed hereto as **Exhibit "E."**

In November 2006, the systems were completed and on November 27, 2006, they were transported to John F. Kennedy International Airport to be exported to Benham Trading Company in the United Arab Emirates, and ultimately Pishtaz in Iran. However, the machines never left the airport, as agents of the Department of Commerce Office of Export Enforcement learned that the intended destination was Iran and intercepted them prior to export.

As set forth in the Presentence Report, Oyster Bay Pump Work's shipment of microplate coating and test tube coating systems to its ultimate destination of Pishtaz Teb Diagnostics in Iran required an export license from the Commerce Department's Bureau of Industry and Security ("BIS"). Mr. Gaillard did not submit an application to obtain this necessary license.

## ATTEMPTS AT COOPERATION

On November 30, 2006, following the seizure of the equipment at the airport, Federal agents arrived at Oyster Bay Pump Works and executed a search warrant. Shortly thereafter, on January 10, 2007, Mr. Gaillard met with the former Assistant United States Attorney assigned to this case, Elaine Banar, along with his former attorney and two agents from the U.S. Department of Commerce for a proffer. As a result of that proffer, Mr. Gaillard agreed to offer his cooperation to the Government by engaging in e-mail and telephone communications with representatives of Pishtaz in an effort to persuade them to come to the United States for training purposes. Although Mr. Tehrani previously traveled to the United States for training, he had since left the company, so a different person needed to be trained on

the equipment.  At this time, no one at Pishtaz was aware that the machines had been seized.

In addition to Pishtaz, Mr. Gaillard also made numerous attempts, under the supervision of Special Agent Elizabeth Blanch, to persuade representatives from a company in another prohibited country to come to the United States to purchase his equipment.  Mr. Gaillard expended countless hours over a three month period of time in an effort to assist the Government producing a voluminous record of emails between Mr. Gaillard and the Special Agent Blanch.  Unfortunately, through no fault of Mr. Gaillard's, these attempts at cooperation failed to produce any significant results.

On June 15, 2007, Mr. Gaillard was arraigned on the aforementioned charge, pled guilty, pursuant to the aforementioned Plea Agreement (**Exhibit "A"**) and was released on a $100,000 Personal Recognizance Bond.

In July 2007, this law firm was retained by Mr. Gaillard.  Upon learning of Mr. Gaillard's unsuccessful attempts at cooperation, Celia Gordon, an associate of this law firm, contacted AUSA Elaine Banar and Special Agent Elizabeth Blanch to inquire as to whether or not there were additional efforts Mr. Gaillard could make in a renewed effort to provide assistance to the Government.

Mr. Gaillard had informed our office that it was essential to his business for him to attend the MEDICA trade fair in Germany every fall and that he hoped to be permitted to attend that year (2007).  Specifically Ms. Gordon inquired of AUSA Banar and Special Agent Blanch as to whether there were efforts they wanted him to make at the MEDICA trade fair with respect to continued cooperation.  Both agreed that he should go to the trade fair and alert them if an opportunity presented itself.  Ms. Banar subsequently left the United States Attorney's Office.  However, Ms. Gordon continued to discuss the matter with AUSA Kelly Currie who consented to Mr. Gaillard's travel to Germany for the MEDICA trade fair.

Accordingly, on September 21, 2007, Mr. Gaillard's bail conditions were amended to a $750,000 Secured Appearance Bond upon the Court's granting of our application that Mr. Gaillard be permitted to travel to

Dusseldorf, Germany for one week in November 2007 to attend the MEDICA 2007 trade fair.  Mr. Gaillard traveled to Germany in November 2007, with the permission of the Court and the consent of both the Government and Pre-Trial Services.

While there were no new opportunities for cooperation presented to Mr. Gaillard at the trade fair, Mr. Gaillard has continued to alert Special Agent Blanch whenever he has received information that he thought might be useful to the Government's investigation.  His efforts in this regard occurred most recently just last month.

Mr. Gaillard has remained at liberty since his arraignment and has at all times been in compliance with the conditions of his release.

## A CONSIDERATION OF SECTION 3553(a)
## STRONGLY FAVORS A PROBATIONARY SENTENCE

Since the United States Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), the United States Sentencing Guidelines are no longer mandatory, but rather are advisory and constitute one factor to be considered by the sentencing court in fashioning a reasonable and appropriate sentence.  In this case, we respectfully submit that a term of probation is a sentence that is fair, just and reasonable.

Most recently, the United States Supreme Court reiterated the importance of the sentencing court's discretion in fashioning an appropriate sentence for the particular criminal defendant before it in *Gall v. United States*, ___ U.S. ___, 128 S.Ct. 586 (2007).  In *Gall*, the Court upheld a sentence of probation for a defendant in a drug conspiracy case who had withdrawn from the conspiracy and had demonstrated a laudable history of education and employment.  The *Gall* Court specifically rejected the notion that only "extraordinary" circumstances can justify a sentence outside of the applicable Guidelines range, and likewise rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Gall, id*, 128 S.Ct. at 595.  The Court further stated a sentence outside the applicable Guidelines range cannot be considered presumptively unreasonable. *Gall, id.*

Page 8 of  28

In *Gall*, the Court made clear that a departure from the Guidelines, even one resulting in an unusually lenient sentence, may be justified if the sentencing court can clearly explain why it is appropriate in a particular case with sufficient justifications.  *Gall, id.*  *Gall* definitively instructs the sentencing court that a Guidelines calculation is a necessary starting point for determining a sentence, but cannot be the end of the Court's analysis.

Instead, the sentencing Court must evaluate and consider the factors set forth in 18 U.S.C. § 3553(a).  *Gall*, *id*, 128 S.Ct. at 596-7.  These factors include a consideration of the nature and circumstances of the offense and of the history and character of the defendant; an analysis of the general purposes of sentencing; the kinds of sentences available; Sentencing Commission policy statements; the need to avoid unwarranted disparities in sentencing; and of course the applicable Guidelines.  18 U.S.C. § 3553(a). *Gall* clearly states that the sentencing court's objective in considering these factors is to impose a sentence that is reasonable.  *Gall*, *id*, 128 S.Ct. at 594.

## THE SENTENCING GUIDELINES

As the Court is well aware, the United States Supreme Court ruled in *Booker*, *supra,* that in determining a defendant's sentence, the court should consider all of the factors set forth in 18 U.S.C. § 3553(a).  *Id.*, at 259-260. Included in these factors is a determination of the applicable sentence under the United States Sentencing Guidelines promulgated by the Sentencing Commission.  *See* 18 U.S.C. § 3553(a)(4)(A).

Although *Booker* established that the Sentencing Guidelines are advisory and not mandatory on the sentencing court, and the calculated Guidelines sentence is to be considered by the Court as only one of several factors in determining a defendant's sentencing, we understand that the Court will still engage in a Guidelines analysis (*see United States v. Crosby*, 397 F.3d 103, 113 [2d Cir. 2005]), and therefore we present herein our Sentencing Guidelines calculations and analysis.  However, we do not by any means assert or concede that such a sentence is reasonable under all of the circumstances presented here.  On the contrary, we respectfully submit that such a sentence would be decidedly unreasonable, given the facts of this particular case, Mr. Gaillard's character and history and the anomalous nature of this arrest.

Page 9 of 28

There is disagreement between the applicable Guidelines calculations as determined by the Government and the defense and as determined by the Probation Department. The table below sets forth the positions of the Government and the defense as set forth in the plea agreement and of the Probation Department regarding sentencing under the Guidelines:

|  | **GOVERNMENT AND DEFENSE** | **PROBATION DEPARTMENT** |
|---|---|---|
| Base Offense Level - U.S.S.G. §§ 2X1.1; 2M5.1(a)(1)(B) | **26** | **26** |
| Adjustment for Role in the Offense: (Supervisory Role, U.S.S.G. §3B1.1(c)) | **NO INCREASE** | **+2** |
| Acceptance of Responsibility (U.S.S.G. §§ 3E1.1 (a) and (b)) | **-3** | **-3** |
| **TOTAL** | **23** | **25** |

The defense, the Government and the Probation Department all agree that Mr. Gaillard should be considered a Criminal History Category I offender, due to the fact that he has had no criminal convictions or sentences prior to his sentencing on this case (U.S.S.G. §§ 4A1.1, 4A1.2).

Accordingly, the applicable sentencing ranges calculated by the Government and the defense and by the Probation Department are set forth below:

| **Applicable Sentencing Range** | **46-57 months** | **57-71 months** |
|---|---|---|

The disparity between the Guidelines sentencing range proposed by the Probation Department and the one anticipated and agreed upon in the plea agreement is based solely on two offense level points that the Probation Department adds for "Role in the Offense."  We respectfully submit that this offense level increase is inappropriate, and that Probation's position should be rejected by the Court.  Neither the Government nor the defense deemed Mr. Gaillard's conduct in the instant case as warranting a two point adjustment for "supervisory role."  Certainly, the Government is far more familiar than Probation with the facts and circumstances of this case and is in the best position to determine all the facts relevant to whether or not Mr. Gaillard warrants an adjustment for supervisory role.  After its consideration of all of the circumstances in this case, the Government has determined that such an increase would be inappropriate for Mr. Gaillard.  Therefore, we respectfully submit that the two point upward adjustment for "supervisory role" is not warranted in this particular case.

## THE PARSIMONY CLAUSE OF SECTION 3553(a)

Although reasonableness is the primary concern for the Court in sentencing, it is not the only concern.  In the so-called "parsimony clause," which precedes the factors set forth above, section 3553(a) dictates that the court should impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing that are set forth in that statute.  18 U.S.C. § 3553(a)(2).  Those purposes are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Page 11 of 28

18 U.S.C. § 3553(a)(2); *See United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006) (analyzing parsimony clause).

Here, the Guidelines, as set forth in the Plea Agreement, call for a sentence of 46 to 57 months[1].  We respectfully submit that a term of probation in lieu of an incarceratory sentence for Mr. Gaillard is more than sufficient to address and satisfy the purposes of sentencing as set forth above.  Certainly, the crime for which Mr. Gaillard stands convicted is a serious one.  However, we submit that the facts and circumstances of this case do not warrant incarceration.  The restrictions placed upon Mr. Gaillard's life and liberty by a sentence of probation would more than adequately reflect the seriousness of this particular case and serve to promote respect for the law.

It is without question that Mr. Gaillard will never again engage in this type of conduct, regardless of the sentence ultimately imposed by the Court.  This one, unfortunate serious lapse in judgment has already cost Mr. Gaillard enormously.  The two OBPW machines that were seized by the Government were built by OBPW with no money paid in advance.  Combined, the two machines cost OBPW approximately $270,000.00 to manufacture.  Mr. Gaillard never received payment from Benham Trading or Pishtaz for this equipment.

The out-of-pocket expense of these machines placed a tremendous strain on the ability of OBPW to continue its manufacturing and business operations.  Additionally, upon the execution of the search warrant, a number of employees became afraid that they might soon be out of work and, therefore, left the company without providing any significant notice. This forced Mr. Gaillard to hire and train people to replace these employees. The abrupt change in personnel caused immediate, lengthy and extremely costly delays in production of important pieces of machinery, severely impacting Mr. Gaillard's business, and in fact OBPW recorded a loss for tax years 2006 and 2007.

---

[1]As previously mentioned, the PSR provides for a range of 57 to 71 months.

Page 12 of  28

As Your Honor will see from the numerous letters annexed hereto, as well as Mr. Gaillard's own letter to the Court, Patrick Gaillard is a man of great pride who is highly regarded as being extremely honest and someone who always does things "by the book."  Although he and his company have suffered economically because of his actions, this consequence pales in comparison to the overwhelming embarrassment and shame that he will undoubtedly carry with him forever.  A particular sentence for this offense is not what will serve to deter Mr. Gaillard from this type of conduct in the future or to protect the public from further crimes.  Rather, it is his own pride and self worth that will prevent him from every again exercising such poor judgment.

Similarly, there is no sentence of this Court that will provide Mr. Gaillard with the necessary training to ensure that this conduct is never repeated.  Immediately after Mr. Gaillard learned he was under investigation, he consulted with numerous law firms and experts in the field of exporting.  He has since learned a great deal about what is and is not permissible with respect to exporting his machines and consults with these experts if he has any questions regarding the legality of a potential business transaction.  As he states in his letter to Your Honor, annexed hereto as **Exhibit "F":**

> **While I am unable to undo what I have done, I have learned a lot from this huge mistake.  I now know more than the lay person and maybe nearly half of what the pros know about the government organizations regulating exports and the services available to guide you through the export process...I have always focused on technology, but now am well aware of the need to stay well informed about export regulations. I assure you that I will not make this mistake again.**

While Mr. Gaillard was aware that he was not permitted to export to Iran, he unfortunately did not appreciate the gravity of his offense.  As he makes clear in his letter to Your Honor, he certainly does now.

Page 13 of 28

Although other defendants have been charged with this specific offense in other cases, the facts of Mr. Gaillard's particular case are truly unique. The machines that Mr. Gaillard designs and manufactures are the only ones of their kind. OBPW microplate and test tube coating systems provide an invaluable service to the medical diagnostic industry across the world. It is because of these particular machines that companies that produce medical diagnostic test kits can produce their kits with greater precision, in greater quantities and with greater speed than ever before. As a result, individuals who are suffering from infectious diseases can be diagnosed quickly and accurately. Simply put, the machines built by OBPW save lives.

Justice would be served by a probationary sentence in this case. The high financial costs of prosecution to the defendant, the shame and uncertainty that come from being accused in a Federal criminal case, the stigma of being branded a convicted felon, and the significant restrictions imposed by probation supervision certainly provide an adequate deterrent to anyone who would otherwise think of committing an offense with facts similar to those in the instant case.

I respectfully submit that the Parsimony Clause dictates that a term of probation is the appropriate sentence in this case.

## PATRICK GAILLARD'S
## HISTORY, CHARACTER AND BACKGROUND

As noted above, the applicable sentence range under the Sentencing Guidelines is only one factor to be considered by the Court in setting Mr. Gaillard's sentence. Another factor to be considered by the Court in determining Mr. Gaillard's sentence for his offense is "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). We respectfully submit that a full consideration of Patrick Gaillard's lack of any criminal background, his history of hard work and responsibility and, above all else, his extraordinary decent character strongly favor a non-Guidelines sentence of probation.

As set forth in great detail below, and supported by the letters of love and support submitted by his family and friends (attached hereto as **Exhibit**

**"G")**, colleagues and clients (attached hereto as **Exhibit "H")** and employees (attached hereto as **Exhibit "I")**, Patrick Gaillard is a man of exceptional character with a history of hard work, dedication, selflessness and responsibility.  To say that Patrick Gaillard is a contributing member of society falls far short of, and completely understates, what he has accomplished in both his personal life and in his work at Oyster Bay Pump Works.

Patrick Gaillard was born on October 11, 1953, in Queens, New York. He is one of four boys born to his parents Raymond and Yvonne Gaillard. One of Mr. Gaillard's brothers died at six months of age, prior to his birth, and another brother was tragically killed at the age of 20 as a result of a car accident involving a drunk driver.  His brother Philip is a real estate developer and currently lives in Brussels, Belgium.

Mr. Gaillard's father was an aerospace engineer, and from a very young age, Patrick Gaillard knew that he too wanted to become an engineer. Mr. Gaillard was always an above-average student.  In 1975, Mr. Gaillard graduated from the University of Michigan with a Bachelor of Science Degree in Engineering.  He went on to receive his Master's Degree in Business Administration from the University of Michigan in 1978.

While in graduate school, Mr. Gaillard married his girlfriend, Diane Bigilin.  Upon receiving his Master's Degree, Mr. Gaillard was offered a position as a Manufacturing Systems Consultant for Haskins & Sells (now known as Deloitte & Touche) in Chicago, Illinois.  Mr. Gaillard was employed by Haskins & Sells from 1978 to 1980 and during this time his first child, Robyn, was born.

In 1980, Mr. Gaillard left his position at Haskins & Sells and moved his family to Boston, Massachusetts to take a job as Operations Manager for a medical supply company called Clinical Assays.  It was at Clinical Assays that Mr. Gaillard was first exposed to the area of medical diagnostic test kits within the medical industry.  Clinical Assays was owned by a company by the name of Baxter Travenol and became a joint venture with a company called Genentec.  Clinical Assays eventually became known as Travenol-Genentec Diagnostics.  At the time that Mr. Gaillard was Operations Manager for Travenol-Genentec Diagnostics, they were competing with

Abbott Laboratories to be the first to market with an AIDS virus diagnostic test kit.

While working on the AIDS project at Travenol-Genentec Diagnostics, Mr. Gaillard dealt with a company called Oyster Bay Pump Works ("OBPW"). The owner of OBPW, Dennis Pinkerton, was so impressed with Mr. Gaillard's honesty and hard work that he asked him to become his partner. A letter from Dennis Pinkerton to Your Honor is annexed hereto as **Exhibit "J."** In 1986, Mr. Gaillard joined Mr. Pinkerton at OBPW and it was a two person company. However, due to family circumstances, Mr. Pinkerton asked Mr. Gaillard if he wanted to purchase the company from him, which he did. By this time, Mr. Gaillard's three other children, Scott, Valerie and Leslie were born.

## OYSTER BAY PUMP WORKS

Since 1986, Mr. Gaillard has worked tirelessly to make OBPW the very best company it can be. He now has a staff of 30 employees and has developed OBPW into a company that produces systems that are cutting edge in the field of medical diagnostics. His microplate coating and test tube coating systems are recognized by those who manufacture medical diagnostic test kits as being the very best of their kind. The importance of these systems can not be overstated. It is the technology designed by OBPW, and Patrick Gaillard in particular, that ensures that every single well of a microplate or test tube is coated exactly right so that every single diagnostic test results in a accurate diagnosis. It is also this technology that has enabled the manufacturers of these test kits to produce their kits in increasingly larger quantities which results in greater efficiency in diagnosing infectious disease in human beings.

Harry Pinkerton, III, President of a company called Fluid Metering, Inc., and the brother of Dennis Pinkerton, the former owner of OBPW, is one of many individuals who have worked with and known Patrick Gaillard who felt compelled to write a letter to Your Honor. In his letter, Mr. Pinkerton discusses the importance of OBPW and Mr. Gaillard to this industry (see **Exhibit "H"**). Specifically, he states:

> **Patrick is one of those few people in the industry who is honest and up front with his customers concerning what he can and can't do. His success has been built on the manufacture of high quality systems that must meet stringent performance standards as they relate directly to people's lives. Without his equipment, medical diagnostic kit manufacturers would be at a great loss to fill the void created by the loss of his expertise. There's just no one else in the world who does what he does nearly as accurately.**

OBPW designs and builds machines for some of the most reputable and well known companies in the field of medical diagnostics. These companies rely on the machines they purchase from OBPW to maintain their ability to satisfy the overwhelming demand for medical diagnostic test kits within the medical community. They rely not only on the machines themselves, but on the continued service of OBPW, and Patrick Gaillard in particular, for repairs, maintenance and troubleshooting. OBPW is Patrick Gaillard. Mr. Gaillard's reputation among these companies is that of someone who is extremely dedicated to his profession and to ensuring that every machine that leaves OBPW will continue to serve its customer for years and years to come. Annexed as **Exhibit "H"** are letters from some of Mr. Gaillard's clients. All of these companies are aware of Mr. Gaillard's guilty plea and have written letters to Your Honor to express their experiences with Mr. Gaillard and the importance of his role in their continued success.

Manny Flores, Engineering Department Manager for Abbott Laboratories had this to say about Mr. Gaillard and OBPW:

> **I recently became aware of Patrick Gaillard's legal issues and decided to write a letter to the court on his behalf...Oyster Bay Pump Works supplies very specialized equipment used to coat micro titer plates used to screen blood for many infectious diseases including hepatitis and HIV.**

> **His unique knowledge is important to success of our projects worldwide and I therefore, urge leniency in his sentencing.**

Roger Budd, ELISA Department Senior Manager for The Binding Site, Ltd., a company located in England that specializes in the research, development and manufacture of immunodiagnostic assays in the field of autoimmune disease, multiple myeloma and investigation of the immune response, also wrote a letter on behalf of Mr. Gaillard.  In his letter, Mr. Budd explains the importance of OBPW machines in the work that his company does:

> **The Binding Site Ltd. has purchased two instruments from Oyster Bay over the last 10 years, these are critical to our manufacturing process, that produces medical diagnostic kits used worldwide, we are currently producing approximately 8 million tests a year using these machines.  The majority of products are FDA approved and used extensively by medical laboratories in the USA.**

Philip Feldsine, President and CEO of BIOCONTROL, a worldwide company that specializes in industrial microbiology testing for food safety, quality control and HACCP (hazard analysis and critical control point) monitoring and a customer of OBPW for 20 years, had the following things to say about Mr. Gaillard and OBPW:

> **Oyster Bay provides a unique product offering to, among others, the medical and industrial diagnostic products industries where extremely tight requirements for precision dispensing systems are critical to making efficacious products for our customers...We would also like to mention that Patrick is highly involved in the design and manufacturing of Oyster Bay products and that Oyster Bay is one of very few companies that can provide such products to**

> **such essential industries as medical and food diagnostic testing products.**

Thomas Hektor, Ph.D., former Director for the departments production and quality management of ORGENTEC Diagnostika GmbH, a German company that produces and distributes in vitro diagnostic test kits for the detection and characterization of autoimmune diseases, expresses similar sentiments in his letter to the Court.  Dr. Hektor explains that his company buys machines from OBPW which is an American company, as opposed to a German company, is because of their **"outstanding expertise"** in the design and production of their machines.  He further states:

> **Oyster Bay Pump Works and hence Mr. Patrick Gaillard as the owner and main head and engineer of the company, is worldwide well-known as a reliable producer of the finest, most reliable, highly precise manufacturing machines, which show a very long durability and necessitate a minimum effort of maintenance.  Mr. Gaillard's company is a small but innovative enterprise which is a hallmark of American engineering.**

Patrick Gaillard is OBPW.  There is no other individual at the company who is capable of designing the custom equipment that they sell, nor is there any other employee who can troubleshoot and solve any problem that may arise with one of the systems.  OBPW simply cannot operate without Mr. Gaillard.  The importance of the continued operation of OBPW is truly monumental.  Ortho Clinical Diagnostics, Inc., a division of Johnson and Johnson, (hereinafter "Ortho") has been buying custom equipment from OBPW for 25 years and have purchased at least 8 machines from them during this time.  As Glenn Douma of Ortho explains in his letter:

> **Ortho manufactures blood typing and blood screening tests at Raritan, NJ that are required to keep the world's blood supply safe…We use custom equipment from Oyster Bay to help**

> **produce infectious disease testing kits. Oyster Bay developed our two Ultrasonic Inspection systems that inspect 3000 tests per minute each to ensure every test is properly produced. We cannot produce product if either of these machines fail which could jeopardize the world blood supply. We rely on Oyster Bay Pump Works and trust in their capability to ensure that our customers will never be out of product and that every test we make will work. A single failure in our business can cost a life.**

Mr. Doumas is aware of Mr. Gaillard's guilty plea, but as he states in his letter:

> **I am sure that exporting of equipment to the UAE with an equipment destination of Iran was a single poor choice of judgment that will never happen again. There are many diagnostic companies world wide that rely on Oyster Bay Pump works for their equipment. In fact, Oyster Bay Pump Works is the only manufacturer in the world of large scale ELISA plate processing equipment. Patrick Gaillard is the main driving force behind his company and without his support the worlds blood supply could be in jeopardy.**

Another customer of OBPW is a company by the name of Immucor, a leading manufacturer of blood bank reagents. Included in **Exhibit "H"** are letters from Ralph Eatz, Senior Vice President of Immucor Gamma and Director Tama Copeland. Both Mr. Eatz and Ms. Copeland stress the importance of Mr. Gaillard to the continued operation of their company. Mr. Eatz explains:

> **Because of the complexity of the equipment many people have input into the building of the equipment but only one person has the**

**complete understanding of how the software and hardware interact. This person is the President of Oyster Bay, Patrick Gaillard.**

Ms. Copeland echoes Mr. Eatz, explaining:

**Since this instrument is custom designed, Oyster Bay is necessary for helping us trouble shoot problems we may encounter with the instrument. There have been times over the years that the Oyster Bay technicians could not** help us resolve the issues we were having. Patrick, the president of the company, would get on the phone and after brief conversations would have us back up and running in no time. Several times over the years Patrick would remain on the phone for over 8 hours holding our hands as we would trouble shoot the problems. Many times this would continue after hours and he would never leave us hanging.

Ms. Copeland further explains that Mr. Gaillard has exhibited a loyalty to their company that they don't often find. Both Ms. Copeland and Mr. Eatz are aware of Mr. Gaillard's guilty plea. Their opinion and respect for him, however, is unchanged. As Ms. Copeland states:

**The integrity he has demonstrated over the years is something you don't see much of anymore in this ever changing, multi-tasking, fast paced world. From both a professional and personal standpoint, I am confident that Patrick's behavior will not be repeated.**

It seems hard to imagine that one individual could play such an important role in a community as large as medical diagnostics. However, as is clear based upon the letters from these companies, Patrick Gaillard is such a man. Francis Capitanio, President of BIOAMERICA, another customer of OBPW states:

**I hope that, when you consider his sentence, you will take into account his lack of prior record,**

**his reputation for being a man of integrity, his remorse for this particular decision, and his value to the medical diagnostics industry.  It would be tragic if this one foolish mistake ruins a lifetime of honest, hard-working endeavor.**

## PERSONAL AND FINANCIAL IMPACT ON OBPW EMPLOYEES

Mr. Gaillard is an engineer.  He is a man who has devoted his entire adult life to advancing the technology in medical diagnostics.  His drive to constantly improve his products runs alongside his desire to create an environment where his employees can grow and share in his need to always do better.  Annexed as **Exhibit "I"** are letters from over twenty (20) of Mr. Gaillard's employees.  These people  who work with Mr. Gaillard every day describe him as someone who has created a **"nourishing atmosphere"** where employees are "encouraged to contribute their ideas."  See Letter from employee Charles Birsner.  Mr. Birsner also states:

> **Mr. Gaillard has an open door policy and will take the time to listen to any employee who wishes to speak to him.**

OBPW Software Engineer Jovan Rokvic shares his opinion of his employer:

> **Mr. Gaillard leads by example.  Both customers and employees respect him because of his high moral qualities, high technical skills, rich experience and unprecedented devotion for his work...I have learned that Mr. Gaillard is unique in a sense that he possesses impeccable knowledge of every implementation detail. That makes him not only the main designer but also a real mentor to all of the company's engineers.**

Mr. Gaillard's employees appreciate and respect the high standards he has set for their work.  They understand the important contribution OBPW makes to the medical diagnostic community and Mr. Gaillard's insistence on precision to uphold this contribution.  OBPW Software Engineer Robert Goldstein states in his letter:

> **...he has frequently brought up the fact that the equipment we manufacture has to be held to very high standards not only because of strict FDA requirements, but because of the critical nature of the products produced by our equipment.**

OBPW Production Control Manager John C. Lanphear describes Patrick Gaillard as a man of "great integrity" who is **"extremely dedicated to his company and employees."**  He too shares his observations with respect to Mr. Gaillard's insistence on perfection, stating, **"his standards for the product that we make for our customers are the highest I have ever encountered."**  OBPW Test Technician Christopher Laterza shares this impression of Mr. Gaillard, stating:

> **...he is passionate about his work and takes great pride in producing a quality product.  He appears to be genuinely interested in servicing his customers – he personally fields technical questions on a daily basis – and has presented himself as a fair and caring superior to his employees.**

Mr. Gaillard has been completely honest and straightforward with all of his employees regarding the instant matter and his responsibility and remorse for it.  As Your Honor can see from their letters, Mr. Gaillard's guilty plea has not changed their opinion as to his integrity and his character.  All describe the great remorse Mr. Gaillard has personally expressed to them and, like his friends and family, remain steadfastly behind him.  This is not to say that they are not concerned about their future and the future of OBPW should Mr. Gaillard be sentenced to prison.  As is clear based upon their letters, as well as the aforementioned letters from the customers of OBPW,

Page 23 of  28

the company would surely be forced to cease operations without the daily presence of Mr. Gaillard.  OBPW Operations Manager Robert Kacinski states in his letter:

> **While it is commonly believed that no organization can exist through the efforts of just one person, I am convinced that OBPW comes as close as you can get.**

OBPW Manager Edward Mancura, who has worked for OBPW for over ten years, perhaps describes the predicament best::

> **Oyster Bay Pump Works is Patrick Gaillard. Patrick Gaillard is Oyster Bay Pump Works. Separate the two and Oyster Bay Pump Works ceases to exist.  One may think that this would be of no great loss and the worst this would do is put nearly thirty people out of work.   In reality it would be much further reaching...The small group of people employed and guided by Patrick Gaillard has a great deal of pride knowing that they build the best equipment of its type.  I would think this is the same pride that someone might have if they work at making Rolls Royce automobiles or Steinway pianos.  The marked difference is ours is more than a fine object.  Ours ultimately saves lives.**

In sum, a sentence of incarceration would have far reaching, devastating effects and would certainly result in life-altering consequences for many, many people.  Accordingly, we respectfully request that Your Honor consider the serious impact on so many other lives in considering a probationary sentence for Mr. Gaillard.

## <u>LACK OF FINANCIAL MOTIVE</u>

Mr. Gaillard's dedication to his profession and relentless hard work is the result of a very pure and genuine motive –  to make a scientific

contribution to the world.  Mr. Gaillard is not driven by a desire to make money and his motive in the instant case had nothing at all to do with financial gain.  To the contrary, Mr. Gaillard makes only a 5% profit on each piece of equipment he sells.  With respect to the two machines that were seized in this case, OBPW would have profited only $13,500.  Mr. Gaillard is a person who truly enjoys what he does for a living.  He derives much greater satisfaction by seeing his designs brought to life and result in cutting edge technology than he does in making a lot of money.  In this case, Mr. Gaillard's decision to sell his equipment to Mr. Tehrani was not the result of a closed door, back room, clandestine plan driven by a desire to line his pockets.  Mr. Gaillard made this decision because he genuinely believed that Pishtaz would use his equipment to help save lives.  As Mr. Gaillard so eloquently states in his letter to Your Honor (**Exhibit "F"**):

> **I am not driven by money or business.  Those things drag me down and take me away from my work...My goals as owner of this company are to create interesting and satisfying career opportunities for my employees while also designing leading edge products for the industry we serve.  Financially, I am happy to just be stable and stay in operation.  None of these efforts are about making money.**

Those who truly know Mr. Gaillard, know this to be the truth.  Annexed as **Exhibit "G"** are a collection of letters from Mr. Gaillard's family members and friends.  These letters, along with the aforementioned letters from his employees and customers, convey exactly who Mr. Gaillard is – a kind, honest person who genuinely cares about helping other people.

Joseph A. DeLucia, D.O., F.A.C.E.P., a longtime friend of Mr. Gaillard states in his letter to the Court:

> **As a physician, I have had many interesting conversations regarding Patrick's company and his medical equipment.  Patrick seems to be very proud of his equipment, especially in the prospective of being beneficial to mankind.**

> **Greed does not seem to govern him like many business people.  Patrick is very generous and unselfish.**

## HIS FAMILY AND FRIENDS

In his personal dealings with family and friends, Mr. Gaillard is just as honest and true as he is in dealing with his customers at OBPW.  The annexed letters from Mr. Gaillard's family and friends describe in detail what a truly exceptional person he is.

Friends Thomas and Maryann Duggan had this to say about Mr. Gaillard:

> **It is obvious that he is a very bright man and the work he does is admirable.  To think that because of Patrick, the medical field has the use of such remarkable equipment.  We are thankful that there are people like him who are able to help us make such advancements in medicine.  With all the new diseases that we are facing, he is not a person that society could afford to be without.**

Although Mr. Gaillard and his wife divorced in 1992, Mr. Gaillard has remained close to his children and has supported them, both emotionally and financially.  Included in **Exhibit "G"** are letters to Your Honor from each of Mr. Gaillard's children.  As you can see in reading these letters, Mr. Gaillard is an exceptional parent who has always led by example.  His youngest daughter, Leslie Gaillard, says this about her father:

> **He has without hesitation or question been there for me and my siblings in any way that we needed.  Financially he has provided us with opportunities that many people will never be so blessed to experience.  Emotionally, he has been the calm and consistent foundation that we all can depend and rely on.  He is wise, intelligent,**

**caring, honest, extremely hard-working, generous, and strong and I know that he will rise above this tragedy as he has all others in the past. He has been my father, my teacher, my role-model, my provider, and my friend throughout my life and it is my hope that at the very least this crisis will only help him to become an even better man than he already is today.**

His son Scott Gaillard expresses how proud he is of his father:

**I am always happy to tell people what my father does, because I know he is successful and that his work benefits others. People might not always understand what "Precision Liquid Dispensing Automation Systems" are ("Oh, like soda machines?" is a common initial response) but just about everyone can appreciate the value of drug discovery and blood screening.**

Following his divorce, Mr. Gaillard's four children lived with their mother. However, after a few years, his daughter Valerie, who had a history of psychological issues became too much for his ex-wife to handle. She informed Mr. Gaillard that she wanted to institutionalize her. Mr. Gaillard refused to permit his daughter to be institutionalized and insisted that she come to live with him. The family court awarded custody of Valerie to Mr. Gaillard and he raised her by himself. After many years of ups and downs and intense psychiatric treatment, Mr. Gaillard's daughter is today a fine young woman with a bright future. Valerie has the following to say about her father:

**When I found out about the situation of my father's business I was shocked. To be honest, I wasn't aware that my father makes mistakes. He's never asked his children for anything. I think of him as perfect. Not just because he's**

**my dad, but because of the example he's led for
the Gaillard family.**

For the last six years, Mr. Gaillard has been dating a woman named
Josephine Poio.  Ms. Poio is a sixth grade science teacher in the West
Babylon Public School District.  Ms. Poio's letter describes exactly the kind
of person Mr. Gaillard is:

> **Patrick is a fair and compassionate employer.
> He is a dedicated father.  I watched Patrick
> raise his daughter Valerie, acting as mother and
> father when his wife cut her ties with Valerie
> for years.  She was a trying teenager but,
> Patrick never gave up on her and now she has
> become a beautiful person.  I see how Patrick
> cares for his elderly parents, with such
> compassion and understanding.  I see how he
> proudly hangs the American Flag on his home
> for every national holiday.  I also see now how
> distraught he is over having become a felon.
> Please believe me when I tell you that this alone
> is more devastating to him than any other
> sentence that could be imposed.**

## **<u>CONCLUSION</u>**

There is no question that Mr. Gaillard exercised extremely poor judgment in the instant case.  While we understand that this behavior can not be condoned, it is our fervent hope that Your Honor will recognize that Mr. Gaillard's motive was not based in greed or disrespect for the law, but rather a very genuine desire to share his technology with a company that shared a common goal in the medical diagnostic community – to help save lives.

Accordingly, for the aforementioned reasons, we respectfully request that Your Honor sentence Patrick Gaillard to a term of probation.

Respectfully submitted,

/s/

Robert C. Gottlieb (1930)

/s/

Celia A. Gordon (1610)

RCG/cag

cc:    Kelly Currie, A.U.S.A.
       (via ECF and Overnight Mail)